UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
VERONICA SMITH,

                        Plaintiff,

             -against-

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
--------------------------------------------------------------X

**OPINION AND ORDER**

20 Civ. 08547 (JCM)

       Plaintiff Veronica Smith ("Plaintiff") commenced this action on October 13, 2020 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket No. 2).  Presently before the Court are: (1) the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 21), accompanied by a memorandum of law ("Comm'r Br."), (Docket No. 22); (2) the Plaintiff's cross-motion for judgment on the pleadings and in opposition to the Commissioner's motion for judgment on the pleadings, (Docket No. 25), accompanied by a memorandum of law ("Pl. Br."), (Docket No. 27); (3) the Commissioner's reply in further support of her motion for judgment on the pleadings ("Comm'r Reply Br."), (Docket No. 32); and Plaintiff's reply in further support of her cross-motion for judgment on the pleadings ("Pl. Reply Brief") (Docket No. 33).  For the reasons set forth below, the Commissioner's motion is granted in its entirety and Plaintiff's cross-motion is denied in its entirety.

## I.    BACKGROUND

       Plaintiff was born on September 8, 1969. (R. 76).  Plaintiff applied for DIB and SSI on

March 29, 2018, alleging a disability onset date of January 1, 2017. (R. 221, 230). Plaintiff's application was initially denied on June 5, 2018, (R. 76-83), after which she requested a hearing on July 5, 2018. (R. 85). A hearing was held on June 19, 2019 before Administrative Law Judge ("ALJ") Hilton Miller. (R. 49-60). ALJ Miller issued a decision on June 28, 2019 denying Plaintiff's claim. (R. 11-19). Plaintiff requested review by the Appeals Council, which denied the request on August 11, 2020, (R. 1-6), making the ALJ's decision ripe for review.

## A.    Medical Evidence before the Disability Onset Date

Between February 11, 2014 and December 29, 2016, Plaintiff received treatment for her diabetes, hypertension, HIV and asthma at BronxCare Health System. (R. 372-75, 398-540). The treatment notes from this time frame consistently remarked on Plaintiff's poor adherence to medication as well as her uncontrolled hypertension and diabetes. (*See, e.g.* R. 409, 415, 417, 470). At her appointment on December 29, 2016, a few days before the start of the relevant period, Plaintiff presented with pain in her lower back and right lower leg, rating the pain intensity at 7 out of 10 and describing the pain as electric shock-like with associated numbness. (R. 535). She reported that she had no joint swelling, joint erythema, muscle cramps, muscle weakness, stiffness, transient paralysis, or loss of sensation. (R. 536). Plaintiff had normal motor strength with ranges of motion limited by pain. (*Id.*). The doctor recommended several muscle relaxant medications, home exercise, and an MRI and X-ray of the lumbar spine. (R. 537).

## B.    Medical Evidence after the Disability Onset Date

## 1.    Franklina Nyarko, Nurse Practitioner[1] ("NP")

Plaintiff saw Franklina Nyarko, NP ("Nurse Nyarko") on February 23, 2017 at BronxCare Health System for an HIV follow-up visit. (R. 368-71). Plaintiff stated that she

---

[1] The regulations were amended in 2017 to add advanced practice registered nurses (a category that includes nurse practitioners) to the list of acceptable medical sources, which applies to Plaintiff's claims as they

missed two doses of HIV medication the prior day. (R. 368).  Upon examination, Plaintiff's blood pressure was 171/87, and she was 5 feet and 4 inches tall and weighed 245 pounds. (*Id.*). She presented as well-groomed, well-developed and in no distress, with normal respiratory, cardiovascular, gastrointestinal, neurological, psychiatric and musculoskeletal findings, intact range of motion, no joint swelling, normal strength and intact sensation. (R. 370).  Nurse Nyarko noted in the record that Plaintiff had symptomatic HIV, hypertension, and uncontrolled diabetes mellitus with complications. (R. 371).  She counseled Plaintiff on the importance of safe sex and of taking her HIV medications as prescribed. (*Id.*).  She also ordered bloodwork to monitor Plaintiff's viral load and T-cell counts. (*Id.*).  Nurse Nyarko recommended that Plaintiff monitor her blood pressure, adhere to a low sodium and cholesterol diet, and take all of her medications as ordered. (*Id.*).

Plaintiff saw Nurse Nyarko again on May 16, 2018 for HIV follow-up and a medication refill. (R. 689-94).  She reported that she had not missed any doses of medication over the past week and denied any complaints. (R. 690).  Plaintiff also stated that she quit smoking two years earlier. (*Id.*).  Other than a rash on both arms, her physical examination revealed normal findings, including intact range of motion, no joint swelling, normal strength and intact sensation. (R. 692).  Her depression screening revealed a PHQ-9[2] score of 7, which indicates mild depression. (R. 690).  Nurse Nyarko's impression was that Plaintiff had AIDS, diabetes, depression and hypertension. (R. 693).  Plaintiff admitted not checking her glucose daily, and reported a home blood pressure reading of 154/82. (*Id.*).  Nurse Nyarko again counseled Plaintiff on medication

---

were filed after March 27, 2017. *Cherry v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 658, 661 (2d Cir. 2020) (citing 20 C.F.R. § 404.1502(a)(7)).

[2] PHQ-9 is a nine-item questionnaire that is used to make criteria-based diagnoses of depression.  It scores each of the 9 DSM-IV criteria for depression as "0" (not at all) to "3" (nearly every day). Kurt Kroenke, Robert Spitzer, & Janet Williams, *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16(9) J GEN INTERN MED. 606 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.

adherence, an appropriate diet for diabetes and hypertension, glucose monitoring, and the importance of following up with a mental health provider. (*Id.*).

**2.      Emergency Department Visits at BronxCare Health System**

On March 5, 2017, Plaintiff presented at the emergency department of BronxCare Health System complaining of discomfort in her chest whenever she ate or drank anything, as well as pain on the left side of her head that radiated down the left side of her back to her chest. (R. 545-78).  She had been experiencing these symptoms for the previous three days. (R. 545).  A CT scan of the chest revealed "scattered dependent and discoid atelectasis without gross consolidation," "[m]inimal right pleural fluid with adjacent compressive atelectasis," "[s]uspect mild fluid overload with cardiomegaly and mild interstitial pulmonary edema and minimal right pleural fluid," and "[t]hyromegaly." (R. 334-35, 551, 566).  An X-ray of the chest revealed "[m]ild cardiomegaly," "[i]ncreased interstitial markings bilaterally which may represent an element of pulmonary vascular congestion and/or chronic interstitial lung disease," and "[left] basilar atelectasis versus airspace disease best appreciated on the lateral view." (R. 553, 567).  An echocardiogram showed normal left ventricle cavity size and systolic function with subtle regional wall motion abnormality, grade 1A diastolic dysfunction and impaired relaxation with increased filling pressure, mildly dilated left atrium, normal pericardium without evidence of pericardial effusion, and trace mitral and tricuspid regurgitation. (R. 337-39).  Plaintiff was given antibiotics during her hospital stay and was discharged from the hospital on March 7, 2017 with a prescription for fluconazole. (R. 576).  Doctors recommended that Plaintiff undergo an esophagogastroduodenoscopy but she declined due to her desire to be discharged to make it to an appointment her son had scheduled. (*Id.*).  She agreed to come to the clinic for gastrointestinal and other follow-up. (R. 576-77).

Plaintiff returned to the emergency department on March 8, 2017 with complaints of nausea, abdominal pain, bloating, constipation and fever. (R. 578-616).  She described feeling worse after starting her medications "after a long hiatus/period of non-compliance." (R. 599). She reported a fifteen-pound weight gain over the previous month, and stated that she had been feeling hot, sweaty and very congested, and was experiencing swelling in her neck. (*Id*.).  She also had blurred/worsening vision over the previous month and swelling in both legs. (*Id*.).  A CT scan of the abdomen and pelvis revealed fluid throughout the colon consistent with diarrhea but no bowel obstruction, (R. 339-40, 588, 597), and a chest X-ray showed no acute findings, (R. 590).  Physical examinations showed soft, mild abdominal tenderness diffusely, most prominent on the left, and trace bipedal edema, with otherwise normal findings. (R. 610, 613).  Plaintiff was treated for constipation, and her abdominal pain and bloating resolved. (R. 614).  She had no other complaints and was discharged on March 10, 2017 with stable vital signs and prescriptions for the following medications: ritonavir, darunavir, Epzicom and atovaquone (for HIV/AIDS), Flexeril (for chronic lower back pain), and tizanidine, nifedipine, lisinopril (for hypertension). (*Id*.).  She was told to follow up with Dr. Gonzalez within one week of discharge. (R. 615).

Plaintiff went to the emergency department again on July 7, 2017, complaining of generalized body cramping in her arms, legs and abdomen that began while she was cooking and had been ongoing for several hours. (R. 626-34, 659-61).  She also reported diaphoresis and dizziness after taking her insulin, which resolved. (R. 626).  Upon triage, Plaintiff's blood sugar level was 301, and upon examination, her gait and affect were normal. (R. 626, 628).  Doctors noted that Plaintiff's symptoms were likely due to dehydration and gave her IV fluids and valium, after which she reported feeling better. (R. 628, 633).  Plaintiff was discharged after being educated about the importance of medication compliance. (R. 633).

On August 19, 2017, Plaintiff presented to the emergency department once more, this time complaining of right-sided ear pain, headache and fever. (R. 312-33, 634-46).  Plaintiff stated that she had a stuffy nose and nasal discharge on and off for the previous year, and experienced snoring and waking suddenly at night gasping for air. (R. 648).  She did not have difficulty breathing or swallowing, and denied fatigue or other pain. (*Id*.).  A chest X-ray revealed low lung volumes with mild cardiomegaly, (R. 638), and laboratory tests showed no abnormalities except hyperglycemia, (R. 643).  Lab imaging, including an MRI of the head, neck and face, and CT scans of the head and sinuses, revealed "[c]hronic allergic fungal sinusitis with chronic osteitis and bony erosion." (R. 319, 321, 343-47, 658).  The doctors concluded that she had diabetic ketoacidosis, chronic sinusitis, mucormycosis rhinosinusitis, olatgia, gastoesophageal reflux disease, hypertension, HIV and obesity. (R. 330-31, 655-57).  Plaintiff was given ceftriaxone and vancomycin and started on Ciprodex ear drops as well as an insulin drip. (R. 645).  Doctors recommended that she continue antibiotics, consult an ENT for ear pain and sinusitis, take insulin for hyperglycemia, and monitor her blood pressure. (R. 646, 655).  Plaintiff was discharged on August 24, 2017. (R. 312-17).

**3.     Efrain Gonzalez, M.D.**

Plaintiff presented to Efrain Gonzalez, M.D. ("Dr. Gonzalez") for a follow-up visit on March 24, 2017, a few weeks after she was discharged from the hospital the second time. (R. 363-66).  She stated that she did not miss any doses of her HIV medications in the previous week, and reported continued epigastric pain and pain upon swallowing, describing a feeling of food getting stuck and a burning sensation. (R. 364).  Dr. Gonzalez's examination revealed that Plaintiff's abdomen was nontender and non-distended, not even in the epigastric area, and that she had no leg edema or acute distress. (*Id*.).  Dr. Gonzalez counseled Plaintiff on the importance

of medication adherence and referred her to a gastroenterology consult and cardiology evaluation. (R. 366-67).

On October 25, 2017, Plaintiff saw Dr. Gonzalez again and had numerous blood tests performed. (R. 307-11, 348-51, 376-81).  She reported that she was not taking her antiretroviral or insulin medications. (R. 307-08).  She also expressed that she was feeling depressed, weak and tired, and was suffering from lack of motivation, loss of interest, and lack of energy. (R. 308).  An examination revealed no acute distress, nonlabored respirations, nontender abdomen, and no edema. (*Id*.).  Dr. Gonzalez concluded that Plaintiff had symptomatic, unstable HIV and uncontrolled diabetes, as well as noted Plaintiff's tobacco use. (R. 310-11).  He recommended that she resume antiretrovirals with liquid lamivudine and dolutegravir, and advised her to quit smoking. (*Id*.).  Dr. Gonzalez also referred Plaintiff to a mental health practitioner, an endocrine evaluation, ENT and gastroenterology consults, and screenings for breast and colon cancers. (*Id*.).

At a follow-up visit with Dr. Gonzalez on June 18, 2018, Plaintiff reported that she was compliant with taking her antiretroviral medication and had not missed a dose in the previous week, but was missing doses of her blood pressure and diabetes medications often. (R. 695-700).  Upon examination, Plaintiff was in no acute distress, had no edema in her legs, and her gait was normal. (R. 696-97).  Dr. Gonzalez assessed symptomatic HIV as well as uncontrolled diabetes and stage two hypertension. (R. 699).  He counseled Plaintiff about the importance of medication adherence, gave her Lantus and insulin in pen forms, and prescribed metformin, amlodipine and losartan. (*Id*.).

On October 22, 2018, Plaintiff saw Dr. Gonzalez again. (R. 741-46).  At that appointment, she reported that she had not missed any doses of her antiretroviral medication in

the previous week, but had again been skipping her blood pressure medicine sometimes and her insulin often. (R. 741-2).   Plaintiff reported smoking briefly after her sinus surgery but had since stopped. (R. 741).  She said she was urinating a lot but had no dysuria, and reported no abdominal or back pain. (*Id*.).   An examination revealed no acute distress, a nontender and non-distended abdomen, and no leg edema. (R. 743).  Dr. Gonzalez again discussed the importance of medication adherence with Plaintiff, and referred her to medical case management, an endocrinology consult, and pulmonary and gastroenterology specialists. (R. 744-45).

Plaintiff had another visit with Dr. Gonzalez on December 7, 2018, at which she reported that she missed her ENT, endocrine, gastroenterology, pain management, and pulmonary appointments. (R. 750-55).  She also declined medical case management services. (R. 751).  Dr. Gonzalez reviewed the importance of the consults with Plaintiff and she agreed to reschedule them. (*Id*.).  Plaintiff went to the gynecologist to follow up on her abnormal anal pap test, but rescheduled the procedure because her blood pressure was high. (*Id*.).  She reported taking the amlodipine and lisinopril at the correct doses, and stated she was doing "ok" with the liquid lamivudine and small tablet dolutegravir. (*Id*.).  She was, however, missing doses of her diabetes medication. (R. 753).  An examination revealed that Plaintiff was in no acute distress and had normal gait and fluid speech. (R. 752).  Dr. Gonzalez again emphasized the need for medication adherence, and referred Plaintiff to an endocrinologist, gastroenterologist and ENT, as well as to the pulmonary clinic and women's health center. (R. 753-54).  Dr. Gonzalez also adjusted Plaintiff's hypertension medications. (R. 754).

On April 8, 2019, Plaintiff had a follow-up appointment with Dr. Gonzalez, at which she complained of fatigue and intermittent central chest pain lasting a few seconds at a time. (R. 755-61).  She stated that she was taking lamivudine and dolutegravir "most of the time" and was

trying to adhere to her insulin, although it was hard for her and she disliked it. (R. 756).  Dr.

Gonzalez noted that Plaintiff "has a pill aversion and also hates taking any pills" and that

Plaintiff said that "she is just not good with medications." (R. 759-60).  Plaintiff once again

declined medical case management services. (R. 756).  She reported smoking fifteen cigarettes a

day and Dr. Gonzalez advised her to quit. (R. 757).  On examination, Plaintiff's obesity was

noted, but she was in no acute distress, had no neck mass, her lungs were clear, and she had no

leg edema. (R. 758).  Her abdomen was soft, nontender and non-distended, and her heart rate

was fast but not tachycardic and there was no evidence of a murmur. (*Id*.).  She also had

suprapubic tenderness. (*Id*.).  Dr. Gonzalez repeated lab work relating to Plaintiff's AIDS

diagnosis and expressed his concern that Plaintiff's HIV viral load was detectable. (R. 759).  Dr.

Gonzalez advised Plaintiff again about the importance of medication adherence and referred her

to specialists for evaluation of her thyroid nodule and anemia, and ordered a pelvic ultrasound

and stress echocardiogram. (R. 759-60).  He also recommended that she take 81mg of aspirin

once daily. (R. 760).  Plaintiff refused a colonoscopy, despite being advised of its importance in

cancer prevention. (*Id*.).

**4.      Dipti Joshi, M.D. – Consultative Examiner**

Plaintiff had an internal medicine consultative examination with Dipti Joshi, M.D. ("Dr.

Joshi") at Industrial Medicine Associates, P.C. on May 18, 2018. (R. 382-85).  Plaintiff reported

a history of HIV, diabetes, asthma and hypertension. (R. 382).  Her HIV was diagnosed in 1998

and her most recent viral load was 6808, but she noted that she was asymptomatic at the time of

the consultative examination. (*Id*.).  Her diabetes was diagnosed in 2006, and she stated that she

got occasional cramping in her feet related to her diabetes. (*Id*.).  Plaintiff's asthma began in

2015, with triggers including dust, cold, heat, and walking for more than a block. (*Id*.).  She

reported using nebulizers once a month and her pumps as needed, with her last asthma attack

occurring in 2018. (*Id*.).  Plaintiff had hypertension since 2006 and stated that she was on medication for it. (*Id*.).  She stated that she lived with her four children, and sometimes cooked twice daily, cleaned twice weekly, did laundry once weekly, and shopped once monthly. (R. 383).  She was able to shower, bathe and dress daily. (*Id*.).  She reported spending her time watching television, listening to the radio, reading, and going to the park. (*Id*.).

On physical examination, Plaintiff weighed 231 pounds and her blood pressure was 190/88. (*Id*.).  Dr. Joshi noted Plaintiff's obesity and that she appeared mildly anxious. (*Id*.).  Plaintiff's gait and stance were normal, she was able to walk on her heels and toes without difficulty, and she could squat about 75% of the way down. (*Id*.).  She used no assistive devices, needed no help changing for the exam or getting on and off the exam table, and was able to rise from the chair without difficulty. (*Id*.).  Examination of Plaintiff's skin and lymph nodes revealed eczematous skin changes with hyperpigmentation and some thickening on her back, but no significant adenopathy. (*Id*.).  Plaintiff's ears, nose, throat, neck, chest, lungs, heart and abdomen were normal upon examination. (R. 384).  Her cervical and lumbar spine showed full flexion, extension and rotary movement bilaterally, with full range of motion in both shoulders, elbows, forearms, wrists, hips, knees and ankles. (*Id*.).  She had a negative straight leg raise test with both legs, and her joints were stable and non-tender. (*Id*.).  Neurologic and extremity examination was also normal, with no sensory deficit or muscle atrophy evident, no edema, and a strength of 5/5 in the upper and lower extremities. (*Id*.).  Plaintiff's hand and finger dexterity was intact with a grip strength of 5/5 in both hands. (*Id*.).  Dr. Joshi diagnosed obesity, hypertension, HIV, asthma and diabetes with occasional numbing and cramping in the feet, and noted that her prognosis was stable. (R. 385).  Dr. Joshi opined that Plaintiff should avoid dust, smoke, fumes,

cold and hot temperatures, and strenuous activity, and that she had mild limitations with squatting. (*Id.*).

**5.      Harish Patel, M.D.**

Plaintiff saw Harish Patel, M.D. ("Dr. Harish Patel") for a gastroenterology consult and colorectal cancer screening at BronxCare Health System on July 9, 2018 because of previous abnormal anal cytology results. (R. 700-01).  Dr. Harish Patel noted that Plaintiff was in no apparent distress, had no chest pain, no palpitation, no leg edema, no wheezing, and no arthritis or joint pain. (R. 701).  He concluded that Plaintiff had iron deficiency anemia, abnormal anal cytology, and dysphagia, and offered an esophagogastroduodenoscopy and colonoscopy, which Plaintiff refused. (*Id.*).

**6.      Vivien Leung, M.D.**

On July 18, 2018, Plaintiff had a diabetes follow-up visit with Vivien Leung, M.D. ("Dr. Leung"), an endocrinologist at BronxCare Health System. (R. 702-04).  Dr. Leung noted that Plaintiff was not self-monitoring glucose levels at home, that "[c]ompliance with treatment regimen is poor," and that her diabetes was "poorly controlled." (R. 702).  Plaintiff's A1C level was 11%. (*Id.*).  Plaintiff also complained of numbness in her feet and nausea from her HIV medications but denied palpitations or anxiety. (*Id.*).  Plaintiff's blood pressure was 196/100 and she weighed 224 pounds. (R. 703).  Dr. Leung concluded that Plaintiff had uncontrolled diabetes mellitus with diabetic neuropathy and subclinical hyperthyroidism, for which she ordered ultrasound imaging. (R. 703-04).  Dr. Leung stressed the need for better diabetes control to prevent further complications, including checking her fasting blood sugar at least a few times a week and keeping a logbook. (R. 704).  She also increased her Lantus dosage to 24 units and increased metformin to 750 mg, two tabs daily. (*Id.*).

7. **Rajesh Patel, M.D.**

Plaintiff saw Rajesh Patel, M.D. ("Dr. Rajesh Patel") on July 24, 2018 for an initial psychiatric evaluation. (R. 704-08).  Plaintiff reported that she had trouble sleeping for the previous three years, and recently had been feeling periodic anxiety, restlessness, and was "almost 'panicky'" because she was bothered that she had lost three sisters two decades earlier and "never had [a] chance to talk about it." (R. 705).  However, she generally described her mood as positive and upbeat, and denied vegetative symptoms of acute depression, psychosis or mania, as well as any history of psychiatric admissions or treatment, other than taking Zoloft many years earlier. (*Id*.).  Plaintiff denied any pain or discomfort. (R. 706).  A mental status examination revealed findings within normal limits, including euthymic mood, full range affect, clear speech, goal-directed thought process, and normal orientation, attention/concentration, memory, cognition and insight. (*Id*.).  Plaintiff denied suicidal thoughts, and Dr. Rajesh Patel evaluated her risk level for suicide and violence to be low. (R. 706-08).  Dr. Rajesh Patel prescribed Zoloft and Vistaril for Plaintiff's anxiety, and recommended psychotherapy and follow up in one month. (R. 708).

8. **Robert Wong, M.D.**

On August 15, 2018, Plaintiff saw Robert Wong, M.D. ("Dr. Wong"), an otolaryngologist at BronxCare Health System for a nasal evaluation. (R. 714-19).  Plaintiff complained of possible fungus within the sinuses with congestion and Dr. Wong noted that she had a prior CT scan that showed nasal polyps. (R. 714).  Plaintiff did not have any difficulty swallowing, voice changes, difficulty breathing, otalgia or otorrhea. (*Id*.).  Dr. Wong diagnosed chronic sinusitis, more on the right side than on the left, as well as nasal polyps, and recommended a functional endoscopic sinus surgery. (R. 717).  A preoperative medical

evaluation for the endoscopic sinus surgery noted that Plaintiff's uncontrolled diabetes increased "the risk of infectious and other postoperative complications" and the risks and benefits were explained to Plaintiff. (R. 723).  Plaintiff underwent the surgery on September 11, 2018 and did not suffer from any complications. (R. 725).  During the surgery, Dr. Wong found mucosal thickening with polyps, and performed the following procedures: bilateral endoscopic total ethmoidectomies, bilateral endoscopic maxillary antrostomies, and right endoscopic sphenoidotomy with removal of tissue. (R. 726-27).

 Plaintiff had a follow-up visit with Dr. Wong on September 19, 2018 and complained of headache and congestion after running out of pain medication. (R. 731-32).  Dr. Wong stated that pathology from the surgery was positive for Aspergillus fumigatus. (R. 732).  He diagnosed chronic sinusitis and nasal polyps, noted that crusting was partially debrided, and recommended that Plaintiff continue saline, antibiotics and pain medicine. (R. 733).

Plaintiff came for another follow-up visit on September 26, 2018, complaining of severe pain since the sinus surgery, though she had some improvement in the pain and in breathing. (R. 737).  Dr. Wong referred Plaintiff to the pain clinic and recommended follow up in two weeks for repeat debridement. (R. 739).

## 9.    Charles Lee, D.P.M.

On September 21, 2018, Plaintiff saw podiatrist Charles Lee, D.P.M. ("Dr. Lee") at BronxCare Health System's Department of Orthopedics. (R. 735-36).  Plaintiff complained of plantar pain in both legs with long periods of ambulation and of occasional cramping in both feet. (R. 735).  A physical examination revealed dry skin on Plaintiff's dorsal and plantar aspects of both feet and low arches on weightbearing, but no erythema, edema or open lesions and no structural deformity. (R. 736).  Plaintiff had full range of motion in her ankles and feet, muscle

power in all lower extremity muscles, intact sensation to light touch, and a normal monofilament

test bilaterally. (*Id*.).  Dr. Lee determined that Plaintiff had diabetes, xerosis and pes planus, and

prescribed ammonium lactate to be applied twice daily as well as recommended orthotics,

hydration and daily stretching exercises. (*Id*.).

**C.      Nonmedical Evidence**

**1.      Plaintiff's Function Report**

On April 9, 2018, Plaintiff completed a function report. (R. 263-70).  She stated that she

lived in an apartment with her family, and typically spent her days sleeping a lot, making coffee

or tea with something to eat, watching television in bed, washing dishes, making lunch and

dinner, and heading back to bed. (R. 263).  She said that she took care of her twelve- and

fourteen-year-old children, waking them for school, and that her children helped her with

laundry on the weekends, as well as with cleaning the apartment and preparing meals daily. (R.

263-64).  She used to be able to cook, clean and lift things on her own but could not do so

anymore. (R. 264).  Her conditions also affected her sleep, causing her to be up later at night and

sleep more during the day. (*Id*.).  Plaintiff explained that when she tried to dress herself or care

for her hair, her hands cramped up sometimes, and she could not use the tub to bathe, but rather

was only able to take a short shower. (*Id*.).  She noted that she was able to feed herself and use

the toilet on her own. (*Id*.).  She did not need any special help or reminders to take care of her

personal needs and grooming, but did need reminders to take her medications. (*Id*.).  Her

conditions made it difficult for her to stand for a long time, and thus she needed help doing

laundry and cleaning. (R. 265).  She stated that she went outside two times per week and could

travel alone, including by walking, riding in a car, or using public transportation. (*Id*.).  Plaintiff

did her shopping one hour per month in stores, as well as by mail and computer. (*Id*.).  She noted

that she was able to pay bills and count change, though her conditions made it harder for her and

made her stressed out, and she could not manage a savings account. (R. 266).  She used to be more active, and would go out, walk, and do more for herself, but due to her conditions, her hobbies included watching television and socializing on the phone and computer daily. (*Id*.).

Plaintiff stated that she could not lift anything heavy; stand for long; climb; kneel; or squat. (R. 267).  She could only walk about one to two blocks before needing to rest for five minutes; could sit for about an hour; and could reach "a little." (*Id*.).  Plaintiff sometimes experienced cramping when using her hands. (*Id*.).  She also noted that she had blurry vision, and used glasses/contact lenses every day since she was eight years old. (*Id*.).

Plaintiff first began experiencing pain that impacted her activities in 2013. (R. 268).  She was receiving medical treatment for her pain, including from Dr. Gonzalez, and stated that the pain felt like aching in her legs, and sometimes radiated to her back. (*Id*.).  Plaintiff felt the pain daily, mostly when she walked for a long time, and it lasted for about an hour. (R. 269).  To manage the pain, she was taking Tylenol 500 mg every four hours, as well as codeine, and also was using rubbing alcohol. (*Id*.).

## 2.     Plaintiff's Testimony

Pauline Asemota, Esq. represented Plaintiff at the June 19, 2019 hearing. (R. 49-60).  Plaintiff testified that she was 49 years old, and that the highest grade she completed was a year and a half of college. (R. 49).  She stated that she was last employed in 2015 as a home health aide, a job that she did for about eight years. (R. 52-53).  She stopped working at that job because she was hospitalized with pneumonia for about two weeks. (R. 53).  Though the pneumonia resolved, she did not return back to work because of her other medical problems, which included leg pain, blurry vision, slight arthritis in her hands, neuropathy in the bottom of her feet, asthma, depression, and HIV. (R. 53-54).  Plaintiff also experienced dizzy spells about

once or twice a month. (R. 56).  She had been seeing doctors for these conditions and had been

receiving treatment, such as medication, for her depression, HIV, asthma, hypertension and

diabetes. (R. 54).  Specifically, she took albuterol for her asthma and insulin for her diabetes.

(*Id*.).  Plaintiff testified that her depression started within the past year. (*Id*.).  She said that she

could not walk more than two blocks without stopping because her legs "tighten[ed] up" and she

had pain in the bottom of her feet. (*Id*.).  The medications she took were not helping her, and her

diabetes and hypertension were uncontrolled. (R. 55).  She had tried different dosages and

different types of pills without any change. (*Id*.).  She also sometimes experienced side effects

from the medications, including dizziness and nausea. (*Id*.).  Plaintiff said that she weighed 230

pounds, which had always been her normal weight. (*Id*.).  Plaintiff testified that during a typical

day she was "always fatigued" and "[could not] do too much." (R. 56).  Her son helped her with

sweeping and mopping. (*Id*.).

### 3.      Vocational Expert Testimony

Vocational Expert ("VE") Irene Montgomery ("Montgomery") testified that Plaintiff's

past work consisted of being a home health aide, which is medium, semiskilled work with a

Specific Vocational Preparation ("SVP") of 3. (R. 57).

The ALJ posed a hypothetical to VE Montgomery, asking her to assume an individual of

Plaintiff's age, education and work experience, with the following limitations: the individual can

lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk

and sit with normal breaks for a total of about six hours in an eight-hour workday; occasionally

climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally balance, kneel,

crouch and stoop, but never crawl; and frequently reach. (*Id*.).  The job does not require

manipulation utilizing the bilateral lower extremities such as foot controls or foot pedals, and

does not involve hazards such as dangerous machinery, motor vehicles, unprotected heights or vibrations. (*Id.*).  The individual must avoid even moderate exposure to odors, dust, fumes, gases, poor ventilation, toxic dust, chemicals and other respiratory irritants. (R. 57-58).  VE Montgomery testified that such an individual would be able to perform the jobs of cashier II, marker position in retail settings, and photocopy machine operator, all of which are light, unskilled positions with an SVP of 2. (R. 58).

The ALJ then posed a second hypothetical to VE Montgomery, asking her to consider all the factors in hypothetical one, but now evaluating the functional range of medium rather than light work, which includes lifting and carrying up to fifty pounds occasionally and twenty five pounds frequently. (R. 58-59).  VE Montgomery testified that such an individual would be able to perform the jobs of night cleaner, box maker, and machine feeder, all of which are medium, unskilled positions with an SVP of 2. (R. 59).

Plaintiff's counsel then posed a hypothetical to VE Montgomery, asking her to consider an individual of Plaintiff's age and mental condition, and stating that she may have to miss a day or two out of a five-day work week due to pain and fatigue. (R. 59-60).  VE Montgomery testified that no employer would tolerate such limitations, and thus, this would preclude competitive employment at all exertional levels. (R. 60).

**D.     Evidence Submitted to the Appeals Council**

After receiving the ALJ's June 2019 decision, Plaintiff submitted additional evidence to the Appeals Council for consideration.  This additional evidence included a list of medications with fill dates between May 16, 2018 and November 18, 2018, (R. 45-47), and January 22, 2019 and September 16, 2019, (R. 29-31)  She also submitted hospital discharge instructions from BronxCare Health System from July 25, 2019, regarding acute bronchitis and hyperthyroidism,

and discharge notices and instructions from July 25, and August 16, 2019. (R. 36-42).  In

addition, Plaintiff provided a note from Dr. Eghosa Omoregie, which stated that he saw Plaintiff

for a neurologic consultation on August 29, 2019 and noted Plaintiff's neuropathy diagnosis. (R.

43).

The additional records also included a letter dated March 11, 2020 from social worker

assistant Valerie Taveras, stating that Plaintiff had been a patient of Dr. Gonzalez at BronxCare

Health System since 2001 and in that time, "managed to attend the majority of her medical

appointments and ha[d] been diligent in rescheduling those she was unable to attend." (R. 34).

She also listed Plaintiff's health complications, including uncontrolled diabetes, neuropathy,

coronary artery disease, hyperthyroidism, hypertensive heart disease, asthma, HIV and anal

dysplasia. (*Id.*).  She concluded that Plaintiff's health had gotten "progressively worse" and

expressed her belief that Plaintiff "would benefit from obtaining Social Security [b]enefits that

would assist her not only financially but also help her obtain additional health services." (*Id.*).

E.      **The ALJ's Decision**

ALJ Miller first determined that Plaintiff met the insured status requirements of the

Social Security Act ("Act") through December 31, 2021. (R. 13).  The ALJ then applied the five-

step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R.

§§ 404.1520(a), 416.920(a). (R. 11-19).  At step one, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since January 1, 2017, the alleged onset date. (R. 13).  At

step two, the ALJ found that Plaintiff had the following severe impairments: (1) HIV, (2)

diabetes, (3) asthma, and (4) obesity. (*Id.*).  At step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled the severity of

one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§

18

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 14).

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that Plaintiff is limited to occasionally climbing ramps and stairs; never climbing ladders, ropes or scaffolds; occasionally balancing, kneeling, crouching or stooping; never crawling; never manipulating using the bilateral lower extremities, such as foot controls or foot pedals; and frequently reaching. (*Id.*). The job could not involve hazards, such as dangerous machinery, motor vehicles, unprotected heights or vibrations; and should not include even moderate exposure to odors, dusts, fumes, gases, poor ventilation, toxic dusts, chemicals and other respiratory irritants. (*Id.*). In arriving at the RFC, the ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record. (R. 14-15). The ALJ ultimately determined that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 15). The ALJ found the opinion of the consultative examiner, Dr. Joshi, "persuasive." (R. 16-17).

At step four, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a home health aide because the reaching requirements of this work exceeded her RFC. (R. 17). However, considering Plaintiff's age, education, work experience and RFC, the ALJ opined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (*Id.*). The ALJ thereafter concluded that Plaintiff was not disabled under the Act. (R. 18).

## II.      DISCUSSION

The Commissioner argues that the ALJ's decision should be affirmed because it is legally correct and supported by substantial evidence. (Comm'r Br. at 23-30[3]).  Specifically, the Commissioner contends that the ALJ fulfilled his duty to develop the record, (*id*. at 23-24), the ALJ properly determined that Plaintiff's symptoms were not as severe as alleged, (*id*. at 28-29), and substantial evidence supports the ALJ's RFC determination and his conclusion that there was other work that Plaintiff could perform, (*id*. at 24-30).  Plaintiff argues that the ALJ's decision should be reversed and remanded for further administrative proceedings for six reasons: (1) the ALJ failed to adequately develop the record, (Pl. Br. at 25-27); (2) the RFC is not supported by substantial evidence, (*id.* at 16-18, 22), (3) the ALJ improperly rejected the treating physicians' opinions in favor of the consultative examiner's findings, (*id.* at 18-21); (4) the ALJ erred by cherry-picking evidence, specifically regarding Plaintiff's depression, (*id.* at 21-22); (5) the ALJ failed to fully take into account Plaintiff's descriptions of her disabilities, (*id.* at 22-24); and (6) the ALJ's hypotheticals to the vocational expert were not consistent with the facts, (*id.* at 24-25).

## A.      Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

(1)  whether  the  claimant  is  currently  engaged  in  substantial

---

[3] All citations to the parties' briefs refer to the page numbers assigned upon the electronic filing of the documents.

> gainful activity; (2) whether the claimant has a severe
> impairment or combination of impairments; (3) whether the
> impairment meets or equals the severity of the specified
> impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant
> can perform any of his or her past relevant work despite the
> impairment; and (5) whether there are significant numbers of
> jobs in the national economy that the claimant can perform given
> the claimant's residual functional capacity, age, education, and
> work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has

the general burden of proving that he or she is statutorily disabled "and bears the burden of

proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*,

537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is

other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443,

445 (2d Cir. 2012).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review

is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. §

405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting

*Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way,

a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting

*Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very deferential"

to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's

"or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692

F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

On January 18, 2017, the Social Security Administration ("SSA") considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case.  Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Therefore, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions  . . . " 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael H. v. Saul*, 5:20-CV-417(MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning

issues reserved to the Commissioner — for instance, whether the claimant is disabled under the

Act — are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20

C.F.R. §§ 404.1520b(c), 416.920b(c).

**B.      ALJ's Duty to Develop the Record**

Plaintiff contends that the ALJ failed to develop the record with regard to Plaintiff's

treatment for depression and obesity, and because he failed to ask her questions at the hearing

about her visits to the park and the extent of her daily activities. (Pl. Br. at 25-27; Pl. Reply Br. at

10-11).  The Commissioner argues that the ALJ fulfilled his duty to develop the record because

the record contains treatment notes from all the providers that Plaintiff listed in her application,

these providers were asked to provide any comments on Plaintiff's physical and/or mental

functional ability, Plaintiff and her representative were sent multiple notices about the

importance of submitting any additional evidence and instructions for requesting a subpoena, and

during the June 2019 hearing, Plaintiff's representative did not indicate that any records were

missing. (Comm'r Br. at 23-24).  The Commissioner also maintains that Plaintiff did not point to

any records that the ALJ failed to obtain, including those concerning Plaintiff's depression and

obesity. (Comm'r Reply Br. at 9-10).

"[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n

ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No.

08-CV-1525(LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v.

Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "[W]here there are no obvious gaps in the administrative

record, and where the ALJ already possesses a complete medical history, the ALJ is under no

obligation to seek additional information." *Rosa*, 168 F.3d at 79, n.5 (quoting *Perez*, 77 F.3d at

48) (internal quotation marks omitted).  "Whether the ALJ has satisfied this duty to develop the

record is a threshold question." *Smoker v. Saul*, No. 19-CV-1539(AT)(JLC), 2020 WL 2212404,

at \*9 (S.D.N.Y. May 7, 2020).  The court must be satisfied that the record is fully developed

before determining whether the Commissioner's decision is supported by substantial evidence.

*See id.*

Under the regulations, the ALJ "must develop the plaintiff's 'complete medical history,'

and make 'every reasonable effort' to help the plaintiff get the required medical reports." *Jones*

*v. Apfel*, 66 F. Supp. 2d 518, 523 (S.D.N.Y. 1999) (citing 20 C.F.R. § 404.1512(d)).  "'Every

reasonable effort' has been defined by the regulations to require an initial request for medical

evidence from the medical source, and a follow-up request, followed by a ten-day extension, if

the requested evidence has not been received within ten to twenty calendar days." *Id*. (citing 20

C.F.R. § 404.1512(d)(1)).

Here, the record consists of numerous treatment notes from Plaintiff's providers at

BronxCare Health System, including Drs. Gonzalez, Rajesh Patel, Wong, Harish Patel, Leung,

and Lee. (R. 307-11, 348-51, 363-66, 376-81, 695-708, 714-19, 731-39, 741-46, 755-61).  The

record also includes extensive hospital records and diagnostic imaging results from Plaintiff's

emergency department visits at BronxCare Health System, (R. 312-35, 545-616, 626-46, 659-

61), the medical opinion of the consultative examiner, (R. 382-85), Plaintiff's testimony, (R.49-

60), and Plaintiff's function report, (R. 263-70).  The ALJ also submitted a request for updated

medical information to the providers at BronxCare Health System, and specifically sought

"comments on functional ability, physical and/or mental." (R. 393).  Further, Plaintiff's attorney

stated at the hearing that he had no objections to the evidence and did not identify any gaps in the

record. (R. 51). *See David B. C. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01136(FJS)(TWD), 2021

WL 5769567, at \*7 (N.D.N.Y. Dec. 6, 2021) (finding that the ALJ fulfilled her duty to develop

the record where "Plaintiff did not object to the contents of the record or identify any gaps that

need to be filled… In fact, Plaintiff's counsel affirmatively stated the record was complete.").

Plaintiff specifically argues that the ALJ did not meet his duty to develop the record with regard to her depression and obesity. (Pl. Br. at 26-27). However, the record contains Dr. Rajesh Patel's psychiatric evaluation, during which Plaintiff described symptoms of trouble sleeping, anxiety, restlessness and panic, yet also stated that her mood was positive and upbeat and denied vegetative symptoms. (R. 704-08). Dr. Rajesh Patel's mental status examination revealed findings within normal limits. (*Id*.). The record also contains a depression screening administered by Nurse Nyarko, which revealed a score of 7, indicating mild depression. (R. 689-90). Nurse Nyarko counseled Plaintiff on the importance of following up with a mental health provider. (R. 690). Dr. Gonzalez's treatment notes also contain Plaintiff's reports of feeling depressed, weak, tired, unmotivated, and experiencing loss of interest and lack of energy. (R. 308). Despite Nurse Nyarko's and Dr. Gonzalez's recommendations to Plaintiff to see a mental health provider, (R. 301-11, 693), there is no indication in the record that Plaintiff actually went to see such a provider. Thus, there is sufficient information about Plaintiff's depression in the record, and to the extent there may be other relevant records, Plaintiff failed to identify them. Accordingly, the ALJ met his duty to develop the record regarding Plaintiff's depression.

Plaintiff's obesity is also well-documented in the record. Numerous treatment notes record Plaintiff's weight and height, to assist in assessing her BMI, and many of the practitioners note Plaintiff's obesity, including the consultative examiner who opined on the way Plaintiff's conditions, including her obesity, impact her work abilities and limitations. (R. 55, 368, 383-85, 599, 703, 758). Again, Plaintiff points to no other records that the ALJ failed to obtain with regard to Plaintiff's obesity. Thus, the ALJ met his duty to develop the record regarding Plaintiff's obesity.

Plaintiff also argues that the ALJ failed to fulfill his duty to develop the record by not asking Plaintiff sufficient questions at the hearing regarding her activities of daily living and visits to the park. (Pl. Reply Br. at 10-11).  "To determine whether a claimant received a fair and adequate hearing, a court must consider whether the ALJ adequately assisted the claimant in developing the record by asking questions regarding the disposition and extent of the claimant's subjective symptoms." *Rivera v. Barnhart*, 379 F. Supp. 2d 599, 606 (S.D.N.Y. 2005) (internal quotations omitted).  "This circuit has repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other objective medical evidence." *Hankerson v. Harris*, 636 F.2d 893, 894 (2d Cir.1980) (internal quotations omitted).

Plaintiff correctly points out that the ALJ asked Plaintiff only two questions at the hearing, inquiring about her age and highest level of education. (Pl. Reply Br. at 11; R. 51).  The hearing transcript is also very short, consisting of merely nine pages, (R. 51-60), a factor which courts in this Circuit have considered in determining whether the ALJ asked the Plaintiff sufficient questions at the hearing to adequately develop the record. *See, e.g.*, *Lopez v. Apfel,* No. 98-CV-9036(RPP), 2000 WL 633425, at *10 (S.D.N.Y. May 17, 2000) (noting that the transcript of the ALJ hearing was only eleven pages long in finding that the ALJ did not meet his duty to develop the record).

Although it is true that the ALJ did not question Plaintiff more extensively, Plaintiff does not note any gaps in the record that would have been solved by additional questions.  During her attorney's questioning at the hearing, Plaintiff explained that she is fatigued from day to night, and can only sweep and mop with the help of her oldest son, (R. 56), which addresses Plaintiff's

concern about the extent of her ability to complete chores.  Her attorney also questioned her at

the hearing about her problems with her legs, to which she responded by explaining that due to

her legs tightening and due to pain in her feet, she could only walk two blocks without stopping,

(R. 54), addressing Plaintiff's concern about "what was involved in going to the park." (Pl.

Reply Br. at 10).  The ALJ could not have interpreted from this testimony that Plaintiff was "able

to walk a long distance" or "vigorously exercise," as Plaintiff suggests. (*Id.* at 11).  In fact, in his

summary of Plaintiff's hearing testimony, the ALJ acknowledges that Plaintiff stated she needed

help with her chores and she could not walk more than two blocks without stopping due to pain

in her legs and feet. (R. 15).  This hearing testimony is further reinforced by Plaintiff's function

report, in which she explained that she was no longer able to cook and clean on her own so her

children helped her with laundry, cleaning and meal preparation. (R. 262-64).  She also noted

that she could only walk about one to two blocks before needing to rest for five minutes and

stated that her hobbies no longer included going for walks. (R. 266-67).  In sum, the record was

adequately developed as to Plaintiff's inability to complete chores on her own and walk for long

periods of time, and Plaintiff does not explain what additional questions on these topics would

have contributed. *See Tavarez v. Astrue*, No. 11-CV-2784(FB), 2012 WL 2860797, at *4

(E.D.N.Y. July 11, 2012) (finding that the ALJ did not fail to develop the record where Plaintiff

"refers abstractly to the fact that the ALJ did not ask questions about her pre–2004 treatment…

but does not say what such questions would have revealed, or what missing records the ALJ

should have tracked down, if such records even exist.").  "This is not a case where the ALJ

disregarded [P]laintiff's testimony or medical evidence and simultaneously failed to inquire

further into facts which could support [P]laintiff's contentions, nor is it a case where the ALJ's

neglect in pursuing information led to 'gaps' in the record." *Bosmond v. Apfel*, No. 97-CV-

4109(RPP), 1998 WL 851508, at *9 (S.D.N.Y. Dec. 8, 1998).  Further, the ALJ gave Plaintiff

and her attorney an opportunity to ask additional questions at the end of the hearing, but

Plaintiff's attorney indicated he had nothing further to add. (R. 60); *see Smith v. Colvin*, No. 14-

CV-5868(ADS), 2016 WL 5395841, at *17 (E.D.N.Y. Sept. 27, 2016) ("[A]t the close of the

proceedings, the ALJ gave both the Plaintiff and his attorney opportunities to add and/or clarify

any information relevant to the Plaintiff's application for disability benefits").  Accordingly, the

Court finds that the ALJ was not required to ask additional questions at the hearing in order to

develop the record further.

C.     **The ALJ's RFC Assessment**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial

evidence because there is no evidence to support Plaintiff's ability to do medium level work, the

ALJ's improperly relied on Dr. Joshi's report of her daily activities, and the ALJ erred by

substituting his own judgment for that of competent medical opinions. (Pl. Br. at 16-18, 22).  The

Commissioner contends that substantial evidence supports the ALJ's RFC finding since the

record shows Plaintiff was responsive to treatment and otherwise had mostly normal physical

examination findings despite her non-compliance with treatment. (Comm'r Br. at 24-28).  The

Commissioner also argues that the ALJ properly relied on the consultative examiner's opinion in

determining Plaintiff's RFC. (Comm'r Reply Br. at 2-4).

The RFC is an "individual's maximum remaining ability to do sustained work activities

in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52

(2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2).  The RFC determination is

reserved to the Commissioner. *Monroe*, 676 F. App'x at 8.  When determining the RFC, the ALJ

considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain

and other limitations that could interfere with work activities on a regular and continuing basis."

28

*Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)).

Nevertheless, ALJs are not medical professionals. *See Heather R. v. Comm'r of Soc. Sec.*, 1:19-CV-01555(EAW), 2021 WL 671601, at *3 (W.D.N.Y. Feb. 22, 2021).  The ALJ must refrain "from 'playing doctor' in the sense that [he] 'may not substitute his own judgment for competent medical opinion.'" *Quinto v. Berryhill*, Civ No. 3:17-CV-00024(JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (internal citations omitted).  Accordingly, where the record shows that the claimant has more than "minor physical impairments," *Jaeger-Feathers v. Berryhill*, 1:17-CV-06350(JJM), 2019 WL 666949, at *4 (W.D.N.Y. Feb. 19, 2019), an ALJ is not qualified "to assess residual functional capacity on the basis of bare medical findings," *Kinslow v. Colvin*, Civ. No. 5:12-CV-1541(GLS/ESH), 2014 WL 788793, at *5 (N.D.N.Y. Feb. 24, 2014).  "Regardless of how many medical source statements the ALJ receives – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion in toto." *Cepeda v. Comm'r of Soc. Sec.*, No. 19-CV-4936(BCM), 2020 WL 6895256, at *11 (S.D.N.Y. Nov. 24, 2020).

Plaintiff correctly notes that neither Dr. Joshi's consultative opinion nor the treatment records of other physicians explicitly address Plaintiff's ability to lift or carry up to fifty pounds, a requirement for medium level work. (Pl. Br. at 17).  Dr. Joshi's opinion includes that Plaintiff should avoid "strenuous activity," without defining the term. (R. 385).  However, the overall record, including Dr. Joshi's opinion, consistently demonstrate normal respiratory, cardiovascular and musculoskeletal examination findings, as well as intact range of motion, no joint swelling, normal strength and intact sensation. (*See, e.g.*, R. 308, 364, 370, 383-84, 610, 613, 626, 628, 692, 696-97, 701, 706, 736, 743, 752, 758).  An ALJ may properly conclude that a Plaintiff is capable of medium level work based on the record's consistent normal findings,

even where the consultative examiner does not specifically address the Plaintiff's ability to lift and carry. *See Heitz v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 413, 425 (S.D.N.Y. 2016) (concluding that the ALJ properly found an RFC for medium work even though the consultative examiner "did not make specific conclusions regarding the extent of [Plaintiff's] lifting or carrying limitations" because "his examination and findings as a whole imply that only minimal such limitations exist."); *see also Del Valle v. Berryhill,* No. 18-CV-6622 (HBP), 2019 WL 4254278, at *10 (S.D.N.Y. Sept. 9, 2019) (finding that the consultative examiner's opinion that plaintiff had some "moderate" lifting and carrying restrictions along with his findings that "plaintiff had full range of motion in his lumbar spine, hips, knees and ankles and exhibited full muscle and grip strength and normal reflexes and sensations" was "not inconsistent" with the ALJ's RFC finding of medium exertion.). Thus, any vague terms in the consultative examiner's opinion, such as Dr. Joshi's use of "strenuous activity," must be analyzed in the context of his opinion and the record as a whole. *See Green v. Comm'r of Soc. Sec.*, No. 19-CV-456(HBS), 2020 WL 5554515, at *3 (W.D.N.Y. Sept. 17, 2020). Here, that record suggests largely normal findings rather than a limitation on Plaintiff's ability to lift and carry. Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff was capable of an RFC that involved a medium level of physical exertion.

Plaintiff also argues that the ALJ improperly relied on Dr. Joshi's report of Plaintiff's activities of daily living, claiming she should not be disqualified because "she somehow manages to perform some very basic daily activities." (Pl. Br. at 16-17). An ALJ may properly consider a claimant's activities of daily living as one factor among others in making his RFC determination. *See Messina v. Astrue*, No. 09-CV-2509(SAS), 2009 WL 4930811, at *6 (S.D.N.Y. Dec. 21, 2009) ("The ALJ's considerations of relevant evidence, including … [Plaintiff's] daily

activities…provide sufficient support of his RFC determination.").  Plaintiff's reliance on *Meadors v. Astrue* is misplaced. 370 F. App'x 179, 185 n.2, (2d Cir. 2010).  In *Meadors,* the ALJ gave great weight to the appellant's ability to do chores and the Second Circuit noted that "[a]ppellant's daily activities are only a single factor of many to be considered." *Id.*  In contrast, here, the ALJ relied on Dr. Joshi's findings about Plaintiff's activities of daily living as one factor among others, including the examination results "which note[] no significant abnormalities."[4] (R. 16).  The ALJ also adequately explained both the supportability and consistency of Dr. Joshi's opinion. (R. 16-17).  Therefore, the ALJ properly relied on Dr. Joshi's report in formulating his RFC.

Plaintiff additionally takes issue with the ALJ's conclusion that "her symptoms are related to medication non-compliance," (R. 17), arguing that while her "record of compliance is less than ideal, there is nothing in the record, and the ALJ points to nothing supporting that the reason [for Plaintiff's] impairments w[as] because she had not been as consistent as she should have with her medications." (Pl. Br. at 17).  However, the record is replete with instances of Plaintiff reporting that she missed doses of her antiretroviral, hypertension and diabetes medications and of doctors instructing Plaintiff on the importance of adhering to her medications. (R. 307-08, 366-68, 371, 633, 695-700, 744-45, 753-54, 759-60).  In this context, the treatment notes also consistently remark on the uncontrolled nature of Plaintiff's diabetes and hypertension. (R. 310-11, 371, 699, 703-04).  An ALJ may properly consider Plaintiff's non-adherence to medication as one factor among others when determining the RFC. *See, e.g.,*

---

[4] Plaintiff further argues that it was inconsistent for the ALJ to base his RFC decision on Dr. Joshi's finding of "no significant abnormalities" while finding that Plaintiff had severe impairments of HIV, diabetes, asthma and obesity. (Pl. Br. at 17).  The Commissioner correctly points out in response that the ALJ's step two determination about Plaintiff's severe impairments is a *de minimus* standard, and that it is consistent to find severe impairments and determine an RFC for a wide range of medium work. (Comm'r Reply Br. at 4) (citing *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014)).

*Santiago v. Comm'r of Soc. Sec.*, No. 06-CV-6580(DLI), 2009 WL 2496583, at *11 (E.D.N.Y. Aug. 14, 2009) ("The record supports … the conclusion of the ALJ that, 'non-compliance with medication… [was], at the very least, [a] contributing factor[] to those seizures, of not the outright inciter of them.' …Therefore, substantial evidence supports the ALJ's determination that plaintiff retained the RFC to perform medium-level work."); *see also Melinda J. C. v. Comm'r of Soc. Sec.*, No. 19-CV-01618, 2021 WL 766860, at *4 (W.D.N.Y. Feb. 26, 2021).  Therefore, there is substantial evidence in the record supporting Plaintiff's non-compliance with medication and the ALJ did not err in considering this fact when formulating his RFC.

Finally, Plaintiff claims that the ALJ substituted his own judgment for that of competent medical opinions without explaining how she believes the ALJ did so. (Pl. Br. at 18, 22). Plaintiff's cited cases are distinguishable from the ALJ's opinion here. *See Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("the ALJ improperly substituted her own criteria as to what is necessary to establish a fibromyalgia diagnosis without support from medical testimony."); *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) ("[T]he ALJ simply had no evidence to find that appellant did not meet criteria for statutory blindness ... Dr. Stam's report, as substantiated by the Columbia Presbyterian records, stands unchallenged except by the ALJ's own inference to the contrary."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[T]he Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions that [Plaintiff] could not perform sedentary work. In the absence of a medical opinion to support the ALJ's finding …, it is well-settled that "'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'"); *Greek v. Colvin*, 802 F.3d 370, 375-76 (2d Cir. 2015) (finding that the ALJ's reasons for rejecting the treating

physician's opinions were "factually flawed" and amounted to substituting his own expertise or proof for the treating physician's.).  Here, Plaintiff does not point to a medical conclusion that the ALJ made based on his own judgment that was inapposite to another medical opinion.  In fact, the only medical opinion in the record is Dr. Joshi's, which the ALJ found persuasive.  Accordingly, the ALJ did not err by substituting his own judgment for that of competent medical opinions.

**D.    ALJ's Rejection of the Treating Physicians' Opinions in Favor of the Consultative Examiner's Findings**

Plaintiff argues that the ALJ improperly rejected the treating physicians' opinions in blind reliance on the consultative examination. (Pl. Br. at 18-21).  However, the Commissioner correctly points out that Plaintiff's citations to 20 C.F.R. §§ 404.1420(c) and 416. 920(c) are misplaced given that there are no medical opinions from the treating physicians in the record. (Comm'r Reply Br. at 5-6).  The only medical opinion in the record is from the consultative examiner, and the rest of the record includes treatment records and imaging results from treating physicians.  Further, the ALJ properly addressed the supportability and consistency of Dr. Joshi's opinion, indicating that it was supported by his examination, which noted no significant abnormalities and an ability to perform activities of daily living and 75% of a squat, and was generally consistent with the record, which demonstrates medication non-compliance. (R. 16-17).  The ALJ failed to explicitly note the consultative examiner's specialization, that she saw Plaintiff only once, and that she did not have a treating relationship with her.  Although these omissions constitute procedural error, a searching review of the record assures the Court that this error was harmless and that the ALJ provided good reasons for the weight he gave to this opinion. *See Halloran*, 362 F.3d at 32.

Plaintiff also argues that Plaintiff's treating physicians noted her symptomatic HIV on numerous occasions, whereas Dr. Joshi's opinion only states that Plaintiff had no significant abnormalities. (Pl. Br. at 20).  She contends that the ALJ cherry-picked evidence by ignoring the record documenting Plaintiff's symptomatic HIV.  (Pl. Br. at 21-22).  The Commissioner correctly states that many of the references to symptomatic HIV that Plaintiff cites to are listed in the past medical history portion of the treatment notes, with largely normal treatment findings on that same day's examination, along with indications that Plaintiff had not been adhering to her medication. (Comm'r Reply Br. at 6; R. 320, 354, 360).  Plaintiff herself reported that she was asymptomatic at the time of the consultative examination with Dr. Joshi. (R. 382).  The record does contain other evidence suggesting that Plaintiff's HIV was at times symptomatic, though these findings were largely made in the context of her nonadherence to her antiretroviral medications. (*See* R. 310-11, 356, 371, 699, 759).  Because there is contradictory evidence in the record regarding the symptomatic nature of Plaintiff's HIV, "[i]t is for the SSA, and not this court, to weigh the conflicting evidence." *Schaal*, 134 F.3d at 504.  Accordingly, the ALJ did not err in relying on Dr. Joshi's opinion.

**E.      ALJ's Consideration of Plaintiff's Depression**

Plaintiff argues that the ALJ cherry-picked evidence by ignoring the record documenting Plaintiff's depression. (Pl. Br. at 21-22).  The Commissioner responds that Plaintiff's infrequent complaints of depression, and no abnormal examination findings, do not support a claim that Plaintiff had any significant mental limitations. (Comm'r Reply Br. at 6-7).

"Even where 'substantial evidence supports the ALJ's finding that a claimant's mental impairment was nonsevere, it would still be necessary to remand ... for further consideration where the ALJ failed to account for the claimant's mental limitations when determining her RFC.'" *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 740–41 (S.D.N.Y. 2018) (citing

*Parker–Grose v. Astrue*, 462 F. Appx. 16, 18 (2d Cir. 2012)) (collecting cases); *see also* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe [ ]' ... when we assess your [RFC][.]").  However, "where an ALJ fails to mention non-severe impairments in formulating the RFC, such an error may be considered harmless 'absent evidence that these impairments contributed to any functional limitations.'" *Andino v. Saul*, No. 1:18-CV-00379(JJM), 2019 WL 4621878, at *2 (W.D.N.Y. Sept. 24, 2019); *Trombley v. Colvin*, No. 8:15-CV-00567(TWD), 2016 WL 5394723, at *17 (N.D.N.Y. Sept. 27, 2016) ("While the ALJ may not have specifically mentioned non-severe impairments by name in his RFC analysis, the record as a whole shows that he did evaluate those impairments and their possible limiting effects and found those limitations to be non-existent or *de minimis*, thereby rendering any legal error on his part harmless.").

Here, the ALJ failed to discuss Plaintiff's depression as a non-severe impairment at step two, and makes no reference to it in explaining his RFC.  However, this error is harmless given that there is no evidence in the record to suggest that Plaintiff's depression would contribute to functional limitations.  As discussed above, the record contains Dr. Rajesh Patel's psychiatric evaluation, during which Plaintiff described symptoms of trouble sleeping, anxiety, restlessness and panic and yet also stated that her mood was positive and upbeat and she denied vegetative symptoms. (R. 704-08).  Dr. Rajesh Patel's mental status examination revealed findings within normal limits. (*Id*.).  Nurse Nyarko noted a PHQ-9 score of 7, indicating mild depression, and her psychiatric examination revealed normal affect and behavior. (R. 692).  In a visit with Dr. Gonzalez, Plaintiff reported feeling depressed, weak and tired, and was suffering from lack of motivation, loss of interest, and lack of energy, and Dr. Gonzalez referred her to a mental health

specialist without performing a mental status examination. (R. 308, 311).  None of these records suggest that Plaintiff's depression would limit her ability to work, and thus any error in the ALJ failing to discuss her depression in his RFC analysis was harmless.

## F.   Evaluating Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erred in not fully considering the disabilities she suffered, as described in her testimony at the hearing and her written submission. (Pl. Br. at 22-24).  The Commissioner contends that the ALJ correctly assessed Plaintiff's subjective symptoms and found that her statements were not entirely consistent with the medical and other evidence in the record. (Comm'r Br. at 28-29; Comm'r Reply Br. at 7-8).

"[I]t is the function of the Commissioner to appraise the credibility of witnesses, including the claimant…[A]n ALJ is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 762-63 (S.D.N.Y. 2018) (internal quotations omitted).  The regulations state that the Commissioner will "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [his or her] symptoms affect [him or her]." 20 C.F.R. § 404.1529(a).  However, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [his or her] symptoms have on [his or her] ability to work solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. § 404.1529(c)(2). Rule 16-3p directs the ALJ to specifically consider: (1) Plaintiff's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *See* Soc. Sec. Ruling 16-3p: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016).  "[A]n ALJ is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as the evidence of record permits the court to glean the rationale of an ALJ's decision." *Morales v. Berryhill*, 484 F. Supp. 3d 130, 151 (S.D.N.Y. 2020) (internal quotations omitted).  "Federal courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while testifying." *Jimenez v. Colvin*, 12-CV-6001(PGG)(FM), 2016 WL 5660322, at *13 (S.D.N.Y. Sept. 30, 2016) (internal quotations omitted).

Here, the ALJ properly pointed to inconsistencies between Plaintiff's testimony and other evidence in the record, and gave specific reasons for not giving deference to Plaintiff's allegations. *See Urena v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 271, 287-88 (S.D.N.Y. 2019), *appeal dismissed*, No. 19-1753 (2d Cir. Nov. 7, 2019) (concluding that the ALJ properly considered and discounted Plaintiff's testimony regarding her ability to work due to inconsistencies between her allegations and the record).  The ALJ considered not only the objective evidence, but also Plaintiff's treatment records, the consultative examiner's medical opinion, and Plaintiff's own testimony. (R. 14-17); *see Martes*, 344 F. Supp. 3d at 763 ("[I]n addition to the objective medical evidence, the ALJ considered [plaintiff's] course of treatment, 'the opinions provided,' and his testimony, in addition to 'the medical evidence and other evidence in the record.'").  He stated that though Plaintiff testified that she suffered from pain in

her legs, blurry vision, arthritis, neuropathy, fatigue, and dizziness, "[t]he objective medical record supports [Plaintiff's] HIV result in some degree of functional limitation, but not to the extent alleged," and pointed to Plaintiff's many normal examination findings as well as her medication non-compliance. (R. 15-16).  Plaintiff's non-compliance with medication was properly considered by the ALJ in determining the severity of Plaintiff's symptoms as well as Plaintiff's credibility. *See Wells v. Colvin*, 87 F. Supp. 3d 421, 432 (W.D.N.Y. 2015) (collecting cases) ("[T]he ALJ did not err in considering Plaintiff's noncompliance in evaluating Plaintiff[']s credibility.").

Further, the ALJ's analysis conformed to Rule 16-3p.  The ALJ noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision… [and then] devoted several pages of analysis to provide his reasoning as to [Plaintiff's] actual limitations, which included the ALJ's discussion of the [medical] opinions …, as well as [Plaintiff's] activities of daily living and hearing testimony." *Morales*, 484 F. Supp. 3d at 150 ("Given the detailed analysis performed by the ALJ, we cannot agree that his analysis was 'conclusory' in any way."); *Hutchings v. Berryhill*, 18-CV-1921(PAE)(KHP), 2019 WL 5722478, at \*15 (S.D.N.Y. June 28, 2019), *report and recommendation adopted*, 2019 WL 5722009 (S.D.N.Y. July 16, 2019) ("[I]t is clear to this Court that the ALJ did not ignore Plaintiff's subjective complaints when formulating her opinion, but merely discounted their veracity in light of medical and other evidence in the record.").  As such, the ALJ properly considered Plaintiff's subjective complaints.

**G.      The ALJ's Hypotheticals to the Vocational Expert and Determination That There Was Other Work That Plaintiff Could Perform**

Plaintiff argues that the ALJ's hypotheticals to the vocational expert were not consistent with the facts. (Pl. Br. at 24-25).  The Commissioner contends that substantial evidence supports the ALJ's determination that there was other work that Plaintiff could perform. (Comm'r Br. at 29-30; Comm'r Reply Br. at 8-9).

There is no merit to Plaintiff's argument that because the ALJ found that Plaintiff could not perform her past job as a home health aide, his hypothetical including greater limitations than her prior work was in error. (Pl. Br. at 24-25).  Contrary to Plaintiff's assertion that her old job "was less than 'light,'" the ALJ noted that Plaintiff's past relevant work as a home health aide was classified as medium exertion, the same level of exertion as his RFC, which was also VE Montgomery's testimony at the hearing. (R. 17, 57).  Further, the ALJ explained that Plaintiff's RFC limits her to frequent reaching and the job of a home health aide requires this activity to be performed constantly—thus, this is the limitation that prevents Plaintiff from doing her past work. (*Id*.).  The ALJ could have found that other parameters, like sitting for long periods of time or climbing occasionally, were within Plaintiff's abilities even if she did not need to perform them in her prior job.  The critical question is whether substantial evidence supported the limitations that the ALJ posed in the hypothetical to the vocational expert.  Here, the ALJ's second hypothetical at the hearing was the same as his RFC, (R. 14, 58-59), for which there was substantial evidence, as discussed above. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").  The ALJ also properly relied on the vocational expert's testimony that significant jobs existed in the national economy that Plaintiff could perform at the

medium exertion level. *Burnette v. Colvin*, 564 F. App'x 605 (2d Cir. 2014) (finding that because substantial evidence supported the ALJ's RFC determination, the ALJ did not err in relying on the vocational expert's responses to hypothetical questions based on that RFC.).  Accordingly, the hypotheticals that the ALJ posed to the vocational expert were supported by the facts and the ALJ properly determined that there was other work Plaintiff could perform.

## III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion is granted in its entirety and Plaintiff's cross-motion is denied in its entirety.  The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 21 and 25), and close the case.

Dated:    February 11, 2022
          White Plains, New York

                              RESPECTFULLY SUBMITTED:

                              JUDITH C. McCARTHY
                              United States Magistrate Judge